U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2020 JUL -6  PM 4: 48

CLERK

BY_____ _____
DEPUTY CLERK

KRISSY MAE JEAN J.,              )
                                       )
       Plaintiff,               )
                                       )
       v.                            )       Case No. 2:18-cv-00051
                                       )
COMMISSIONER OF SOCIAL SECURITY,  )
                                     )
       Defendant.            )

**OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE**
**DECISION OF THE COMMISSIONER, DENYING THE COMMISSIONER'S**
**MOTION FOR AN ORDER AFFIRMING THE DECISION, AND REMANDING**
**FOR A CALCULATION OF BENEFITS**
(Docs. 7 & 8)

Plaintiff Krissy Mae Jean Johnson is a claimant for Social Security Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social

Security Act. She brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision

of the Social Security Commissioner (the "Commissioner") that she is not disabled. The

Commissioner moves to affirm.

After Plaintiff's application was initially denied by the Social Security

Administration ("SSA"), Administrative Law Judge ("ALJ") Dory Sutker found her

ineligible for benefits based on her conclusion that Plaintiff is not disabled because she

could perform light work with certain exertional and non-exertional limitations, but could

not perform any past relevant work. Plaintiff argues the ALJ erred in according greater

weight to the opinions of non-treating, non-examining state agency medical consultants

and lesser weight to the opinions of Plaintiff's treating medical providers in violation of

the treating physician rule.

Plaintiff is represented by Phyllis E. Rubenstein, Esq. Special Assistant United

States Attorney Kathryn S. Pollack represents the Commissioner.

## I.     Procedural History.

On October 14, 2014, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of November 3, 2011. Her date last insured is September 30, 2017. The SSA initially denied her applications on March 31, 2015, and on reconsideration on August 4, 2015. Plaintiff filed a timely request for a hearing on August 11, 2015. On January 18, 2017, a videoconference hearing was held before ALJ Sutker at which Plaintiff and Vocational Expert ("VE") Christine E. Spaulding testified. On March 1, 2017, the ALJ issued a written decision finding that Plaintiff was not disabled. Plaintiff filed a timely appeal with the SSA's Office of Disability Adjudication and Review Appeals Council (the "Appeals Council"), which denied her request for review on January 25, 2018. The ALJ's decision thus stands as the Commissioner's final determination.

## II.    The ALJ's Application of the Five-Step, Sequential Framework.

In order to receive DIB and SSI benefits, a claimant must be disabled on or before his or her date last insured.[1] SSA regulations set forth the following five-step, sequential framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citations omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Sutker concluded at Step One that Plaintiff had not engaged in any substantial gainful activity since November 3, 2011, her alleged onset date. At Step Two, she concluded that Plaintiff had the severe impairments of migraines, generalized anxiety disorder, degenerative disc disease, status post right shoulder surgery, depressive disorder, and pain disorder.

At Step Three, the ALJ evaluated Plaintiff's impairments and concluded that none of them met or medically equaled the severity of a listed impairment. The ALJ found that Plaintiff had moderate limitations in understanding, remembering, or applying information; moderate to marked limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in managing herself.

ALJ Sutker determined that Plaintiff had the following Residual Functional Capacity ("RFC") at Step Four:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally perform most postural activities, but cannot climb ladders, ropes or scaffolds, can occasionally reach overhead with the right upper extremity, can tolerate no more than moderate noise, cannot tolerate extremes of temperature, cannot tolerate concentrated exposure to dust, fumes or odors, cannot tolerate excessive vibration, is limited to uncomplicated tasks that can typically be learned in 30 days or less, can tolerate incidental contact with the public as long as dealing with the public is not part of her job duties, requires an environment where tasks are generally performed in a

solitary manner, but could perform tandem tasks up to 10 percent of the
work day and she can collaborate with supervisors and co-workers on
routine matters.

(AR 155.)

At Step Five, the ALJ determined that Plaintiff was capable of performing other

jobs that exist in significant numbers in the national economy, such as collator operator,

price marker, document preparer, and simple sorter. On this basis, the ALJ concluded that

Plaintiff was not disabled.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review

of the administrative record to determine if there is substantial evidence, considering the

record as a whole, to support the Commissioner's decision and if the correct legal

standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013)

(quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir.

2013) (internal brackets and quotation marks omitted) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of

the record, the court must uphold the Commissioner's decision when it is supported by

substantial evidence and when the proper legal principles have been applied. *See* 42

U.S.C. § 405(g). The Commissioner, not the reviewing court, resolves evidentiary

conflicts and determines credibility issues, and the court may not substitute its own

judgment for that of the Commissioner. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d

Cir. 2002); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591

(2d Cir. 1984).

B.      **Whether the ALJ Erred in the Weight She Assigned to Certain Medical Opinions Regarding Plaintiff's Physical Limitations.**

Plaintiff contends the ALJ committed reversible error by according "significant weight" to the opinions of non-examining, non-treating state agency medical consultants Geoffrey Knisely, M.D., and Carl Runge, M.D., because they rendered their opinions in March 2015 and July 2015 and thus did not review Plaintiff's treatment records from July 2015 through November 16, 2016. While acknowledging that the opinions of the state agency medical consultants were rendered without the benefit of subsequent treatment records, the ALJ noted that "[m]edical evidence subsequent to [the state agency medical consultants'] review . . . has been considered and additional limitations have been articulated in the [RFC], viewing the claimant's allegations in the most favorable light allowable." (AR 160.)

"In contrast [to a treating physician's opinions], in evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (internal quotation marks omitted). "[T]he ALJ should weigh a consultative examiner's opinion using the same factors used to weigh the opinion of a treating physician[.]" *Elder v. Comm'r of Soc. Sec.*, 2017 WL 1247923, at *11 (E.D.N.Y. Mar. 24, 2017).

"In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). Provided that the non-examining sources' opinions "are supported by evidence in the record[,]" the ALJ may "permit the opinions of non[-]examining sources to override treating sources' opinions[.]" *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("[T]he opinion

of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citation omitted).

Drs. Knisley and Runge did not review medical records created after the dates they rendered their opinions, many of which relate to Plaintiff's migraines and neck and back pain, including treatment notes documenting that she received medial branch blocks (AR 1196-97, 1351), radiofrequency ablations (AR 1332, 1341, 1358, 1368), and facet joint injections (AR 1146-48, 1381); as well as attended physical therapy sessions for back, neck, and shoulder pain and headaches (AR 1177-83). In addition, Plaintiff was assessed with peripheral vertigo (AR 1396-97) and received emergency room care for migraine headaches (AR 1458-60). In February 2016, she was prescribed oral Toradol for headaches.

In her assessment of the record, the ALJ accounted for the limited scope of the state agency medical consultants' review of Plaintiff's records by reviewing subsequent medical evidence and apparently adding restrictions based on that review. Although an atypical and arguably improper approach, any error was harmless because the restrictions the ALJ imposed based upon the subsequent treatment records were supported by substantial evidence. For example, with respect to Plaintiff's migraines, the ALJ recounted a "rarity of a few visits to emergent care [which] were not sufficiently often to support a debilitating impairment." (AR 156.) Numerous treatment records indicated that Plaintiff's headaches improved with medication and occurred less frequently over time. *See* AR 771 ("Denies any new onset of headaches, she does have p.r.n. headaches less than once a month. Indocin resolve[s] these."); AR 1019 ("She notes that when she first started the Fluoxetine her headaches increased, but now they seem to be decreasing and they are relieved with the Indocin."); AR 1241 ("Had a medial branch block done in neck on 1/29. Plans to have [a radiofrequency ablation ("RFA")] of this in the not too distant future. May have helped with headache frequency but she is not sure. Improved dramatically when she had steroid injection."); AR 1381 ("Negative for . . . headaches"). The ALJ thus properly found subsequent migraine treatment records did not undermine the state agency medical consultants' opinions.

6

Similarly, ALJ Sutker noted that a February 2014 MRI found only minor facet degenerative change that was otherwise unremarkable. A January 28, 2015 treatment record recounted that Plaintiff had "not tried PT, CHIRO or injections[,]" (AR 1106) and on February 4, 2015, it was observed that Plaintiff had a normal gait, was able to stand and walk without difficulty, had mild tenderness to palpation of the lumbar spine, normal strength upon examination of the lower extremities, and no gross sensory deficits. (AR 1055.) Also in February of 2015, she had a "quite complete" range of motion in her shoulders, could raise her arms above her head, and had no significant pain when pressure was applied to her lower back other than in her previous injection sites and no sciatic notch tenderness. (AR 1069.) Straight leg tests were negative, although Plaintiff exhibited slowness and some difficulty bending down and touching the floor and returning to a seated position after lying down. In reporting increased back pain in June of 2015, Plaintiff revealed that she had been riding on an ATV and had plans to drive to Georgia eight weeks later. At that time, she did not have any neurological deficits, had moderate tenderness in her back, and full (5/5) strength in her lower extremities.

In October of 2015, Plaintiff's neck had a normal range of motion, and her gait, station, and coordination were normal. In June of 2016, Plaintiff reported sharp, burning pain that became progressively worse with a pain level of 8/10. She further reported requiring assistance to get out of bed in the morning or out of her recliner due to severe pain with a numb feeling in the left side of her neck from the base of her skull radiating down between her shoulder blades. Despite these reports, Plaintiff also reported caring for her great nephews because her mother, who normally cared for them, had health problems. On March 7, 2017, Plaintiff received a cervical epidural injection, and two weeks later she reported a seventy percent improvement in her neck pain. Following lumbar RFAs on March 29, 2017, and April 13, 2017, Plaintiff indicated to her treatment provider that she experienced relief for approximately six months.

At the January 18, 2017 hearing, the VE opined that Plaintiff was qualified for employment as a collator; price marker; document preparer to scan documents; and a simple sorter, which the VE further opined Plaintiff could learn in a "30-day period of

time or less." (AR 286.) The ALJ took Plaintiff's physical limitations into consideration, limiting Plaintiff to light work and incorporating the following restrictions into her RFC determination: occasionally perform most postural activities; never climb ladders, ropes, or scaffolds; occasionally reach overhead with the right upper extremity; tolerate no more than moderate noise, or excessive vibration; and have no exposure to extreme temperatures. *See* AR 155.

Because "[n]o case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record," *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016), ALJ Sutker's decision to assign "significant weight" to the state agency medical consultants' opinions regarding Plaintiff's physical impairments, which was supported by substantial evidence in the record, was not erroneous particularly where, as here, the ALJ appropriately reflected Plaintiff's physical limitations in her RFC. *See Fuller v. Berryhill*, 2018 WL 1419795, at *5 (D. Conn. Mar. 22, 2018) (concluding "the ALJ did not err in giving the consultants' opinions significant weight despite their not having viewed the supplementary records."); *see also Sanborn v. Berryhill*, 2017 WL 923248, at *14 (D. Vt. Mar. 8, 2017) (affirming ALJ's decision to accord great weight to non-examining medical consultant's opinion that relied on "a substantial portion of Plaintiff's medical records[]" where the assessment was "supported by the record, when considered as a whole, and especially in light of the lack of objective testing or scans that support the claimant's debilitating pain as described") (internal quotation marks omitted).

### C.      Whether the ALJ Erred in the Weight She Assigned to Certain Medical Opinions Regarding Plaintiff's Mental Limitations.

Although Plaintiff acknowledges that "[t]he opinions of a nurse practitioner or counselor are not evaluated under the treating physician rule because they are not . . . acceptable sources, but are rather one of the 'other sources[,]'" she argues that, with regard to her mental limitations, the ALJ erred in according "greater weight" to the opinions of state agency medical consultants Ellen Atkins, Ph.D., and Edward Hurley, Ph.D., and "lesser weight" to the opinions of Nurse Practitioner Naomi Badger, FNP, and

Pamela Fadness, M.D., Plaintiff's treating psychiatrist. She points out that not only were her treating providers' opinions supported by lengthy treating relationships and frequent exams, but they were corroborated by other relevant medical evidence including the opinions of Martin Brutus, Ph.D., Richard Edelstein, M.D., and Jessica Terrien, PMHP, who treated Plaintiff during 2014 and 2015 for major depressive disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD"). (Doc. 7-2 at 3) (citing 20 C.F.R. § 404.1513(a)). The Commissioner responds that ALJ Sutker properly accorded Nurse Practitioner Badger's and Dr. Fadness's opinions lesser weight because they concluded Plaintiff could not work at all, a determination reserved to the Commissioner. In addition, the ALJ found their opinions insufficiently supported by the record.

SSA regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity" of the claimant's impairments, including "symptoms, diagnosis and prognosis," what the claimant "can still do despite impairment(s)," and the claimant's "physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). Under the treating physician rule, an ALJ considering the opinion of a claimant's treating source first must decide "whether the opinion is entitled to controlling weight." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2).

> [I]f the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must explicitly consider the following, nonexclusive *Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.

*Estrella*, 925 F.3d at 95-96 (internal quotation marks omitted) (second alteration in original). "At both steps, the ALJ must give good reasons . . . for the weight [it gives the] treating source's [medical] opinion." *Id.* at 96 (alterations in original) (internal quotation

marks omitted). However, "slavish recitation of each and every factor" is not required so long as "the ALJ's reasoning and adherence to the regulation are clear[.]" *Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 494 (S.D.N.Y. 2019) (internal brackets omitted) (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)). "An ALJ's failure to explicitly apply the *Burgess* factors when assigning weight" to a treating physician's opinion "is a procedural error" that is harmless only if "a searching review of the record assures [the court] that the substance of the treating physician rule was not traversed[.]" *Estrella*, 925 F.3d at 96 (citations and internal quotation marks omitted).

Because Nurse Practitioner Badger is an "other source[]" rather than an "acceptable medical source[]," SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006) (internal quotation marks omitted),[2] the ALJ had "discretion to determine the appropriate weight to accord [her] opinion based on all the evidence before [her.]" *Diaz*, 59 F.3d at 314. "Other source" opinions are evaluated using the same factors as other non-treating source medical opinions because they "may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources." 20 C.F.R. § 404.1527(f)(1). Those factors include: (1) "[h]ow long the source has known and how frequently the source has seen the individual;" (2) "[h]ow consistent the opinion is with other evidence;" (3) "[t]he degree to which the source presents relevant evidence to support an opinion;" (4) "[h]ow well the source explains the opinion;" (5) "[w]hether the source has a specialty or area of expertise related to the individual's impairment(s);" and (6) "[a]ny other factors that tend to support or refute the opinion." SSR 06-03P, 2006 WL 2329939, at *4-5; *see also* 20 C.F.R. § 404.1527(c).

---

[2] SSR 06-03P was rescinded effective March 27, 2017. *See* Rescission of Soc. Sec. Rulings 96-2p, 96-5p, and 06-03p, Fed. Reg. 82, 15,263 (Mar. 27, 2017). Because Plaintiff filed her applications prior to March 27, 2017, SSR 06-03P applies to her claim. *See id.* ("This rescission will be effective for claims filed on or after March 27, 2017."); *Harrison v. Comm'r of Soc. Sec.*, 2018 WL 3153399, at *3 n.4 (W.D.N.Y. June 28, 2018) ("SSR 06-03p has been rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, but remains in effect for claims filed before March 27, 2017.").

"[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,'" particularly if "he or she has seen the individual more often" and "has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03P, 2006 WL 2329939, at *5; *accord* 20 C.F.R. § 404.1527(f)(1).

The treating physician rule does not require the ALJ to defer to a physician's opinion on an issue reserved for the Commissioner's judgment, "including the ultimate finding of whether a claimant is disabled and cannot work[.]" *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). However, the Commissioner's prerogative to determine disability "does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134 (remanding to Appeals Council "for a statement of the reasons on the basis of which [plaintiff's treating physician's] finding of disability was rejected").

In this case, Nurse Practitioner Badger began treating Plaintiff in November of 2013 and in May 2014 opined that Plaintiff was "[n]ot at all . . . released to work[]" due to chronic pain and depression. She explained that Plaintiff's treatment includes "[h]ome exercises/stretching, muscle relaxants, anti-inflammatories, and antidepressants. Working on counselling & seeing psychiatry." (AR 1279.) She stated Plaintiff could participate in career or life skills workshops, engage in a trial work experience, or participate in voluntary work for fifteen to twenty hours per week but required the "[a]bility to take breaks when needed due to physical & mental health." *Id.* Nurse Practitioner Badger found that Plaintiff "has a lot of chronic pain that is worsened by depression[]" and "[m]ay have days where she finds just getting out of bed difficult." *Id.* In September 2014, Nurse Practitioner Badger again opined that Plaintiff was "unable to work at . . . her usual occupation, [and] could [not] work in any other type of employment[]" due to

11

major depression, for which she was prescribed medication and had only a fair prognosis. (AR 1278.)

In December 2016, after an approximate seven-month course of treatment, Dr. Fadness diagnosed Plaintiff with major depressive disorder, recurrent, moderate, as well as PTSD, pain disorder associated with psychological and physical factors, and sleep disorder. She opined that Plaintiff's prognosis was guarded due to Plaintiff "undergoing investigations, treatments, & medication trials." (AR 1277.) Dr. Fadness noted that Plaintiff had previously been prescribed:

> Zoloft, Wellbutrin. . . . She previously trialed Effexor XR 225 mg daily with fairly good response, however, she felt abnormally numb/with lack of emotions. She does not wish to take Effexor dose that high again. She notes big improvement from Hydroxyzine for anxiety. She started psychotherapy, is getting more support & more frequent follow up with FPA therapist.

(AR 1449.) To treat Plaintiff's PTSD, Dr. Fadness increased Plaintiff's dosage of clonidine and continued hydroxyzine and hydrochloride. She noted that a "[t]rial of Prazosin to target sleep, nightmares, and to decrease sympathetic NS tone did not agree with her d/t increased irritability, increase in some strange experiences of possible dissociation and de-personalization . . . [and] did not decrease[] nightmares or improve[] sleep." (AR 1450.) Dr. Fadness changed Plaintiff's dosage of oxcarbazepine for her pain disorder.

Dr. Fadness noted that Plaintiff has extreme difficulty interacting with the public based on her tendency to avoid interpersonal interactions, as well as avoidance of speaking directly to people and on the phone. Dr. Fadness observed that Plaintiff has a "[l]ow frustration tolerance, easily becomes irritable. Very low self[-]esteem, feels not capable, and develops extreme anxiety related to interacting on her own. Anger, lashes out." (AR 1440.)

Dr. Fadness opined that Plaintiff had marked difficulty making judgments on simple work-related decisions and noted Plaintiff exhibited "[a]cute signs/symptoms of increased anxiety associated with even thinking about making decisions. Anticipatory anxiety: elevated heart rate, shortness of breath, [shaky], catastrophizes, overly focused

12

on making a mistake, can't think clearly about anything else." (AR 1439) (emphasis in original). Dr. Fadness noted that Plaintiff has marked difficulty interacting appropriately with supervisors and co-workers and responding appropriately to typical work situations and to changes in a routine work setting and identified the following additional limitations:

> Unable to be consistent, would find ways to leave or wouldn't show up, could not be dependable or reliable. Panics, feels trapped, urges to flee. . . . Isolates, interacts with family as little as possible and then only by electronic messaging. Strained relationships, poor interpersonal skills. Anxiety becomes exhausting. Insomnia. Adverse reactions to psychotropic medications. Migraines interfere with working. Has fallen asleep at work. Drowsy driving.

(AR 1440.)

The ALJ dismissed these comprehensive opinions as providing "no genuine rationale[,] seemingly based on the claimant['s] self[-]report[,]" and inconsistent with other evidence in the record. (AR 160.) The ALJ apparently accorded no weight to Dr. Fadness's status as a specialist, the lengthy treatment relationship, and the similarities between Dr. Fadness's opinion and those of Nurse Practitioner Badger. The ALJ's further conclusion that Dr. Fadness's opinions conflicted with the record appears to ignore the opinion of state agency examining counselor Terry Padilla, LCMHC, who assessed generalized anxiety disorder, depressive disorder NOS, and Axis III and IV problems and assigned Plaintiff a GAF score of 48.[3] In a March 2015 Mini- Mental Status Exam, Counselor Padilla observed:

---

[3] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereafter "DSM-IV")). GAF scores rate the overall psychological functioning of an individual on a scale of zero to 100, *see Scott v. Colvin*, 2016 WL 5173252, at *6 (E.D.N.Y. Sept. 21, 2016) (citing DSM-IV (text revision) at 34), and are assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning. *See Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, at *12 (S.D.N.Y. Jan. 23, 2015). "A GAF in the range of 41 to 50 indicates '[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, OR school functioning (*e.g.*, no friends, unable to keep a job).'" *Zabala v.*

[Plaintiff] has a difficult time clearly answering questions, mumbles, and states, "I don't know how to say it." This behavior could be a result of anxiety. She exhibits no signs of frank psychological disturbance and affect is full range. Upon asking how she would describe the way she feels most of the time, she replies, "Depressed and afraid (mostly of the dark). I'm also afraid of people. I always feel like I'm doing it wrong." Memory: "Sucks." Concentration: "Not very good either." Task to completion: "It takes me all day." Judgment: "I'm always telling myself I'm doing it wrong."

(AR 1073.) Counselor Padilla asked Plaintiff to write a sentence, and she wrote, "I want to go home." (AR 1074) (internal quotation marks omitted).

In summarizing the exam, Counselor Padilla concluded:

[Plaintiff] exhibits anxious behavior with difficulty formulating her speech. *There is no reason to doubt her claim that she is also depressed.* She and the enclosed reports indicate she is in chronic pain. [Plaintiff] reports that she was raped 3 times and is "scared to death of the dark." She also has trouble sleeping. *It is very possible that she has posttraumatic stress disorder.* She is strongly encouraged to seek out counseling of DBT or CBT to help correct some of the distortions that hamper [her] life. In [Plaintiff's] current condition, both emotional and physical, *she is not able to manage employment.*

*Id.* (emphasis supplied).

Counselor Padilla's opinions comport with diagnoses made by other providers as well. In a February 3, 2014 intake evaluation at Northeast Kingdom Human Services, Dr. Brutus diagnosed Plaintiff with major depressive disorder, recurrent, moderate; anxiety disorder; and assigned a GAF score of 55. On May 8, 2014, Dr. Edelstein conducted a psychiatric consultation at North Country Hospital and diagnosed dysthymia, panic disorder, chronic pain, and inability to work and assigned a GAF score of 55. He noted

---

*Astrue*, 595 F.3d 402, 406 n.2 (2d Cir. 2010) (quoting DSM-IV at 34). "GAF scores in the 51-60 range signify moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Daniel v. Astrue*, 2012 WL 3537019, at *7 n.3 (E.D.N.Y. Aug. 14, 2012) (quoting DSM-IV at 32) (internal quotation marks omitted). "[T]he utility of [a GAF score] is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Berry v. Comm'r of Soc. Sec.*, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015).

Plaintiff's long history of chronic depression, which was beginning to respond to Effexor, her occasional panic attacks, and her significant insomnia and concluded Plaintiff's conditions were in the context of childhood and adult trauma and PTSD. On April 13, 2015, Plaintiff initiated care at Community Health Services of Lamoille Valley with Ms. Terrien, who diagnosed depression with symptoms dating back to childhood and difficulty sleeping for the prior two years.

In deciding to accord both "lesser weight" and "significant weight" to Dr. Fadness's assessments of Plaintiff's mental impairments, the ALJ described her reasons as follows:

> The opinion of treating source Pamela Fadness, MD, of Family Psychiatry CVMC, dated August 2016 that the claimant cannot work due to her mental health symptoms (Exhibit 44F) is given lesser weight because the opinion is articulated merely in a check-off list form, providing no genuine rationale and is seemingly based on the claimant-self report. Further, the same treatment notes documenting the claimant's depressive symptoms, also document that her symptoms have responded to and have improved by appropriate treatment with psychotherapy and such medications as Effexor (Exhibit 56F). Under those evidentiary circumstances, this treating source opinion is given lesser weight.

> The opinion of treating source, Pamela Fadness, MD, of Family Psychiatry CVMC, dated December 2016, that the claimant's mental health impairments are of listing level severity, manifested by extreme functional limitations understanding, remembering and carrying out complex task[s] (Exhibit 53F), is given significant weight. However, the opinion that the claimant has extreme functional limitations appropriately interacting with the public is given lesser weight. The extreme limitation in public interaction is not supported and is inconsistent with the evidence consisting of attending examinations without incident, having a relationship with a boyfriend and doing some shopping even at off hours. Given the evidence as a whole, the claimant's difficulty in this functional area does not clearly rise to an extreme level of functional limitation. Further, the residual functional capacity articulates functional limitations that appropriately reflect the claimant degree of limitation supported by the substantial medical evidence of record.

(AR 160-61.)

Although the ALJ correctly observed that Plaintiff is in a relationship, there is no "rule or regulation requiring that a claimant seeking disability on the basis of a mental

impairment[] be precluded from having friends, a spouse, or a companion." *McAninch v. Astrue*, 2011 WL 4744411, at *21 (W.D.N.Y. Oct. 6, 2011). Similarly, Plaintiff's ability to shop and attend appointments does not negate the existence of a disability because "it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" *Stoesser v. Comm'r of Soc. Sec.*, 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011) (quoting *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (concluding ALJ erred in concluding claimant could perform sedentary work because she cooked, shopped for herself, and used public transportation)); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (stating "on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.").

On balance, the court has no difficulty in determining that the ALJ failed to provide good reasons for failing to accord controlling weight to Dr. Fadness's opinion and for further finding the treating physician rule was violated.

### D.     Whether Remand for the Calculation of Benefits is Warranted.

In deciding to accord Dr. Fadness's opinions less than controlling weight, the ALJ did not provide "good reasons" and she did not analyze the opinions in accordance with the *Burgess* factors. Instead, she substituted her judgment for that of the medical providers and concluded that Plaintiff's treatment had been effective and her relative minimal public interaction was sufficient evidence that employment with incidental contact with the public could be tolerated. Notably, ALJ Sutker does not cite a single medical opinion in support of her conclusion that Plaintiff is able to maintain full-time employment and to interact appropriately with supervisors, coworkers, and the public. The error was not harmless as the VE was not asked if Plaintiff could perform the identified positions if contact with others was significantly limited.

Where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for a calculation of benefits is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *see also Jennifer W. v.*

16

*Comm'r of Soc. Sec.*, 2020 WL 549357, at *19 (D. Vt. Feb. 4, 2020) ("Since there is no apparent basis to conclude that a more complete record might support the Commissioner's decision, the court will remand for calculation of benefits."). A treating physician's opinion in this case was supported by substantial evidence in the record and uncontradicted by any other evidence. Consistent with the treating physician rule, the ALJ was required to afford it controlling weight. Had she done so, she would have been compelled to reach the conclusion that Plaintiff's mental impairments rendered her disabled. *See Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999) (remanding for calculation of benefits where "the records provided persuasive evidence of total disability that rendered any further proceedings pointless."); *see also Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990) (remanding for calculation of benefits where there was an "infinitesimal likelihood that employment of any kind would be available" to claimant).

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for an order reversing the Commissioner's decision (Doc. 7), DENIES the Commissioner's motion for an order affirming the decision (Doc. 8), and REMANDS the case for a calculation of benefits.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 6ᵗʰ day of July, 2020.

Christina Reiss, District Judge
United States District Court